SEABOARD NATIONAL BANK OF NEW YORK, Assignee, Appellant, v. WOESTEN et al.

In Banc, December 24, 1898.

147  467
f155  405
147  467
158  556
147  467
90a  688
147  467
s176   59

1. **Municipal Authority: CONTRACTS: GUARANTIES.** Under the very broad and general powers granted St. Louis, that municipality has the same right, in order to secure good and durable work in the construction and maintenance of her streets, to require of the contractor any guaranties that a private person might take in order to secure the perfection of work done for him.

2. ————: ————: ————: MAINTENANCE OF STREETS. The officers of the city, as a part of their duty to secure perfection in the construction of a street and in the materials used, may contract for the construction of the street and, as a part of the contract,

for the maintenance thereof for a reasonable time, at a proper compensation. This power is implied in the very broad powers granted to the city over its streets by its charter, though nothing is said therein about the maintenance or the taking of a bond guaranteeing such maintenance. And although the cost of construction may be chargeable against property owners, and the cost of maintenance against the city, yet the special tax bills against the property owner are not illegal because there were included in the advertisement for bidders and in the contract itself separate terms and conditions for the construction and for the maintenance.

3. ———: ———: FRAUD ON LANDOWNER. Nor is the contract for the construction and maintenance of a street for ten years void, because the city and contractor, by collusion, in following the methods prescribed by the ordinance for advertising for bidders and awarding the contract, may so divide the cost of construction and the cost of maintenance, as to place a part of the cost of maintenance on the property owner as if it were a part of the cost of construction, no fraud being shown. The issue in such case is one of fraud and collusion, and the·burden is on the property owner to prove it.

4. ———: ———: FRAUD OF BOARD: CONTRACTOR. If the mode of letting a contract for constructing and maintaining a street is not in violation of the city's charter, the contractor should not suffer on account of the fraudulent purposes of the board in awarding it unless he participated in the fraud. Objections of that kind come too late after the work has been completed.

5. ———: ———: ———: MAXIMUM LIMIT FOR BID. Nor is such fraud established by the fact that the board had a rule, of which the contractor had knowledge, that no bids for maintenance should exceed a certain price per square unless the evidence establish the fact that the cost of construction, levied against the property owner, was thereby rendered unjust to him.

6. ———: ———: ———: REPAIRS. The power to contract for the maintenance of a street in good condition, for ten years, is not withheld by a provision in the city's charter restraining the municipal assembly from contracting directly for making repairs to streets—the obligation to maintain being imposed as a mere guaranty of the perfection of the construction when completed, and the work of repairs being for the restoration of a street already defective. (Distinguishing Verdin v. City of St. Louis, 131 Mo. 26; and Barber Asphalt Paving Co. v. Ullman, 137 Mo. 543.)

*Transferred from St. Louis Court of Appeals.*

REVERSED.

BOYLE, PRIEST & LEHMANN for appellant.

(1) This section of the ordinance when taken at what it says does not contemplate that any part of the burden of maintenance shall be put upon the property owners, but that they shall pay the cost of reconstruction fairly let, and the city the cost of maintenance; and that both could to the mutual advantage of property owner and city be let at the same time. Ordinary business contracts are let upon this basis with a view to economy, and why should cities be denied the advantage of such business customs? The plan of letting is eminently just for it determines the lowest bidder by the aggregate of the cost of reconstruction and of maintenance. A bidder under this letting, if disposed to depart from a fair and honest rule, could not more easily bid more on construction and less on maintenance than he could more on maintenance and less on construction. Each under this provision must have a specific bid; and the advantage of coupling is the usual advantage of trade that you can get two jobs done at less cost comparatively than you can one. It is the usual difference between wholesaling and retailing. Charter, sec. 542; Ordinance, 16,943. (2) This mode is also beneficial to the property owner. The city does not exhaust its power to charge against property the cost of reconstruction by one reconstruction. Whenever in the judgment of its officers having that matter in charge, it is expedient and wise to reconstruct a street, even if it had been constructed and reconstructed, it may again reconstruct and tax the expense thereof against the property. This has been the uniform ruling of this court since the case of McCormick v. Patchin, 53 Mo. 33. Under the present charter of the city of St. Louis, it was so held in

Farrar v. St. Louis, 80 Mo. 379. (3) The effect of the above mode of letting, in addition to insuring careful, honest, faithful and efficient work in reconstructing, is to protect the property owners from the more costly improvement of a reconstruction in the near future. It is in the nature of a guaranty that during the specified period of maintenance the street will not again be reconstructed. (4) There is no suggestion thus far that the cost of maintenance was less than reasonable, or that the reconstruction was more than reasonable, nor that the compensation for either was minimized at the expense of the other. Each bears upon the face of the transaction its just proportion of cost. Nor is there a single fact stated in the answer which would impeach the apparent fairness and justice of the transaction. There is no fraud charged against either the contractor or the board of public improvements. How then have the defendants suffered a wrong? Morse v. West Port, 110 Mo. 509; Gibson v. Owens, 115 Mo. 267. (5) A law may be void in part and valid as to the rest; and so may a contract. A law which deals with two subjects may be invalid as to one and valid as to the other. Curtis v. Leavitt, 15 N. Y. 96; Com. v. Hitchings, 5 Gray, 485; State v. Clark, 54 Mo. 36; Johnson v. Duer, 115 Mo. 379; Cooley on Taxation, p. 215; French v. Edwards, 13 Wall. 506; Cape Girardeau v. Reilly, 52 Mo. 427; St. Louis v. Foster, 52 Mo. 514. (6) All that the defendants urge may be true and still they will be liable upon the ground of estoppel. The majority of the court in Verdin v. The City of St. Louis, 131 Mo. 26, gave but slight attention to this feature of that case, which was brought to their consideration, and it seems to us without a proper appreciation of those fundamental principles of estoppel which operate under circumstances of this character. The court assumes there that wherever the action of the city council is void the principles of estoppel can not be invoked. The error of that position is pointed out in the minority opinion on pages 143 and 147. In addition to the dissent-

ing opinion we beg leave to call the attention of the court to the case of the city of St. Louis v. Davidson, 102 Mo. 151; also to the case of Cluggish v. Kuhns, 43 Central Law Journal (Ind.), p. 244; Fehler v. Gosnell, 35 S. W. Rep. (Ky.) 1125; Gosnell v. Louisville, 14 Ky. 719.

HIRAM J. GROVER and DENIS DEVOY for respondents.

(1)   Every issue of law raised by the Seaboard National Bank in this case has been raised and argued on the same identical facts, by and in behalf of the Seaboard National Bank itself in the case of Verdin v. City of St. Louis, 131 Mo. 26, and the issues of law there argued were finally determined adversely to the contention of the litigant in this case.    (2)   The general provisions of section 542, revised ordinances of the city of St. Louis, directing reconstruction of streets and the maintenance of all streets so reconstructed, to be let together; and ordinance numbered 17151, ordering Jefferson avenue to be reconstructed with Trinidad Lake asphaltum, when there were other asphaltums equally as good; and directing a contract for such reconstruction of said street, and for the repair thereof for nine years, to be let in the same contract and to the same contractor, are absolutely null and void. Steckert v. E. Saginaw, 22 Mich. 104; Dallas v. Ellison, 30 S. W. Rep. 128; Cooper v. Freeman Lumber Co., 31 S. W. Rep. 981; Wealthy on Assessments, sec. 519; Galbreath v. Newton, 30 Mo. App. 398; Coke, Third Institutes, p. 181; 2 Robinson Patents, sec. 9; 2 Cooley's Blackstone [3 Ed.], p. 159; R .S. Mo. 1889, 6561.    (3)   Neither the State nor any subdivision thereof can lawfully agree to pay public money to a monopoly whose existence is prohibited by the laws of the State.    People v. North River Sugar Refining Co., 121 N. Y. 582; Standard Oil Co. v. Adoue, 83 Tex. 650; Lester v. Continental Brewing Co., 2 Pa. Dis. Ct. 177; Vulcan Powder Co. v. Powder Co., 96 Cal. 516; Warren v. Barber Paving Co., 115 Mo. 578; In re Manhattan Savings Trust, 82 N. Y. 142;

City v. Gault, 117 Ill. 20; City v. Potter, 119 Ill. 324; Levy v. Chicago, 113 Ill. 650; Labs v. Cooper, 40 Pac. Rep. 1042. (4) It was unlawful for the board to advertise and let together in one contract and to the same contractor the contract for reconstruction and maintenance. Brown v. Jenkins, 98 Cal. 10; People v. Maher, 56 Hun. 81; Schenectady v. Trustee, 66 Hun. 179; Gilmore v. Utica, 131 N. Y. 27.

MACFARLANE, J.—This is an action to recover the amount of a special tax bill assessed against the property of defendants in favor of the Barber Asphalt Company, and assigned to plaintiff.

The petition charges that the assessment was made pursuant to authority of ordinance number 16,943, approved November 26, 1893, which provides for the reconstruction of Grand avenue, upon which defendants' said property abuts.

The answer is in the nature of a cross-bill in equity. It sets out in detail the provisions of the charter of the city of St. Louis, the general ordinance providing for the construction and reconstruction of streets, and the proceedings under which the improvement of Grand Avenue was made. It charges that for various specified reasons which will be stated in the opinion, the ordinances, contract and tax bill are null and void, and prays that the tax bill be set aside.

The reply is in effect a general denial of the new matter charged in the answer.

The case was tried upon the facts, most of which were agreed upon. Judgment was for defendants and plaintiff appealed to the St. Louis Court of Appeals where it was affirmed on authority of the decision of this court in the case of Verdin v. City of St. Louis, 131 Mo. 26. Afterwards, on motion for a rehearing, the appeal was certified to this court on account of a supposed conflict between that decision and the later decision in the case of Barber Asphalt Paving Co. v. Ullman, 137 Mo. 543.

The following is a summary of the charter provisions, the ordinances and proceedings under which the improvement of Grand Avenue which resulted in the tax bill, was made, as the same appears from the agreed statement of facts and from the evidence.

Section 27, article 6, of the charter provides: "The Assembly shall have no power directly to contract for any public work or improvement, or repairs thereof, contemplated by this charter or to fix the price or rate therefor; but the board of public improvements shall, in all cases, except in case of necessary repairs requiring prompt attention, prepare and submit to the assembly estimates of costs of any proposed work, and, under the direction of the ordinance, shall advertise for bids, as provided for purchases by the commissioner of supplies, and let out said work by contract to the lowest responsible bidder, subject to the approval of the council. Any other mode of letting out work shall be held as illegal and void."

Section 18 of said article 6 requires "the repairs of all streets" to be paid for out of the general revenue of the city, and the paving of all streets to be "charged upon the adjoining property as a special tax" not exceeding the amount of twenty-five per cent of its assessed value.

By section 26, article three, the mayor and assembly are given the most ample power and control over the streets of the city, and general authority to construct, pave and keep them in repair.

General ordinance 564 (the same as 542 considered in the Verdin case), provides in detail for letting contracts for street construction and for what the contract shall require. Among other matters it provides:

"Whenever a street is to be improved, either on the motion of the Board of Public Improvements or on petition of the adjoining property owners, the Board of Public Improvements may submit to the Municipal Assembly a bill for letting

in one contract the work of constructing or reconstructing such street and of maintaining it in good condition for a term of years; and after such bill has become a law the Board of Public Improvements shall advertise for proposals including the construction or reconstruction and maintenance under the same regulations as are provided for the improvements of streets; but the advertisement shall, in addition to what is prescribed for other street improvements, state the term during which the street is to be maintained in good condition." It requires further: "The contract shall provide that the obligation of the contractor to maintain the streets in good condition shall commence one year after the completion and acceptance of the work of construction or reconstruction, and the contract price shall be paid semiannually out of the city treasury, on the certificate of the street commissioner that the work has been performed in accordance with the contract and specifications."

In canvassing the proposals the lowest bid is required to be ascertained "by taking the aggregate amount of the cost of construction or reconstruction, as the case may be, and the total cost of maintenance, for the term of years designated by the ordinance."

The Board of Public Improvement submitted to the assembly and that body passed and the mayor approved a special ordinance (number 16,942), for the improvement of Grand Avenue between St. Louis Avenue and Montgomery streets.

"Section 1 of this ordinance directs the Board of Public Improvements to cause Grand Avenue from St. Louis Avenue to Montgomery street to be reconstructed with the best quality of Trinidad Lake asphalt, and to contract for the maintenance thereof for a period of nine years commencing one year after the work of reconstruction is complete and accepted.

"Sections 2 and 3 recite the specifications and are unimportant in this contest. Section 4 provides for a lien for the

cost of reconstruction against abutting property. Section 5 makes an appropriation for the cost of reconstruction above twenty-five per cent of the assessed value of the abutting property, while section 6, the last of the ordinance, makes an appropriation in general terms out of a fund set apart for street repairs—'reconstructed streets'—for the cost of maintenance.

"Pursuant to the mandate of this ordinance the Board of Public Improvements advertised to let the authorized work to bidders under letting notice No. 3844, 'for reconstructing with best quality of Trinidad Lake asphalt, Grand Avenue from St. Louis Avenue to Montgomery street and for the maintenance of the same. Deposit required, $435. The street to be maintained in good condition for a term of nine years beginning one year after the completion and acceptance of the work. Bond for $5,910 must be given for the maintenance in addition to the bond for reconstruction when contract is executed. . . . . . . . Plans, specifications and forms of contract may be seen at the office of the street commissioner.'

"In response to this advertisement there was but one bidder either for the work of reconstruction or the maintenance, who was the Barber Asphalt Paving Company. Its bid was as follows:

'Taking up old roadway...................$ 1,379.00
New 6 " curbing.............................  1,680.00
Old curbing reset...........................     10.00
Maintenance per annum......................  1,773.00
Asphalt pavement on 6 " concrete.............. 11,820.00

    Total ...............................$16,662.00

"Pursuant to this bid the work was let to the Barber Asphalt Paving Company and the contract entered into under date of February 9, 1893."

The contract is very elaborate in the specifications of the required work, following the requirements of section 564.

The contract contains this agreement in regard to maintenance:

"The said, The Barber Asphalt Paving Company, party of the first part, expressly guarantees to maintain at grade and surface in good order the aforesaid work of reconstruction for the full period of nine years, commencing one year after the said work of reconstruction is completed and accepted, and binds himself, his heirs and assigns to make all repairs which may from any imperfection in said work or materials become necessary within that time; and the party of the first part shall, whenever notified by the street commissioner that repairs are required, at once make such repairs at his own expense."

It appears from the evidence that prior to 1893 the durability of new pavements was unsatisfactory and the board concluded that a remedy could be secured by including in the contracts a requirement that the contractor should maintain his work for a term of years. In order to enforce this remedy the assembly in 1883, passed an ordinance which is now section 564 of the general ordinances of the city. Since the adoption of this ordinance all contracts for construction and reconstruction of streets has contained a maintenance clause similar to the one found in this contract, and all contracts have been let in the manner required by the ordinance.

The evidence shows that there was an unwritten agreement or understanding among the members of the Board of Public Improvements that no bid for maintenance should be accepted which was in excess of fifty cents per square per annum. This rule was never promulgated by an order of the board or put upon record in any form, but was an unwritten rule which was uniformly enforced. There was no direct evidence that the contractors were notified of this rule but as bids for maintenance thereafter seldom, if ever, went beyond the amount so fixed, and so

far as appears no bid for a greater amount was ever accepted, it may be inferred that contractors were advised thereof.

Mr. Fladd and Mr. McMath, who had been members of the board, testified as witnesses in regard to the adequacy of the price fixed for the maintenance of streets newly paved. Mr. McMath was of the opinion that fifty cents per square had not compensated contractors for maintenance. It appears that he opposed the rule. Mr. Fladd was of the opinion, from his knowledge and experience, that the price fixed for maintenance was generally reasonable and adequate, but in some cases was not. "It was about the best we could do."

The objections made to the tax bills by the answer in this case are in most particulars the same as those stated in the petition in the Verdin case. For full statement see report of that case.

The provisions of the charter, the ordinances, the advertisement for proposals, and the manner of ascertaining the lowest bidder, as charged in the petition, were, in every material particular, the same as were shown by the evidence in the trial of this case. The petition in that case charged that fifty cents per square per annum, would not compensate the contractor, for maintaining the work for ten years and the bid for construction was made proportionately higher in order to secure fair compensation for the entire contract, by which an unjust and illegal charge was imposed upon the property. In this case we have the evidence bearing upon that charge.

In the Verdin case, upon the facts stated in the petition, the truth of which the demurrer admitted, the contract was held invalid.

By their answer defendants, for the same reason, charge the invalidity of this contract. The question in this case must be determined from the evidence.

1. It appears very conclusively from the ordinances, the advertisement for bids, the bids made by the Barber Asphalt Paving Company, the terms of the contract, and the

other evidence when taken together, that the obligation required of the contractor to maintain the completed work was intended to secure an improvement that would endure for ten years without restriction, and at the same time to avoid casting upon the property owner the burdens of bearing the cost that might necessarily be incurred in securing such durability. The obligation imposed upon the contractor to maintain his work was clearly intended to constitute a part of the original contract for the reconstruction of the street and was not intended as a contract for repairing streets which were not good enough for use and were not bad enough for reconstruction. This purpose appears very clearly from the known evils the ordinances were intended to remedy, the terms of the advertisement for proposals, and the stipulations contained in the contract. Under the contract the Asphalt Paving Company guarantees the work for nine years and binds itself to make "all repairs which may, from any imperfection of the work or materials become necessary within that time."

The question then is whether or not the municipal authorities had the power to require the guaranty found in this contract, and if they had such power, was the manner of exercising it violative of the constitutional or charter rights of the landowner whose property is chargeable with the cost of reconstruction.

In the Verdin case, upon the facts stated in the petition, it was held that the requirement of section 542 (which is the same as section 564 of the general ordinances as revised) that the contractor should maintain the pavement for a term of years, could not be distinguished from a contract for "repairs" within the meaning of section 27 of article 6 of the charter. That a contract for repairs is required to be let to the lowest bidder and therefore section 564 of the general ordinances authorizing a contract for reconstruction and maintenance to be let together to the lowest average bidder, was in violation of said section of the charter and the contract was null and void.

Since the decision in the Verdin case, this court has held that an agreement by a contractor to maintain, at his own cost, for five years, a pavement he had contracted to construct, was not an agreement to make repairs on a street within the meaning of a charter which required that "the cost of repairing and keeping in repair the paving and macadamizing of all streets and avenues shall be paid out of the general revenues of the city." [Barber Asphalt Paving Co. v. Ullman, 137 Mo. 543; 38 S. W. Rep. 458.]

The general powers granted St. Louis over its streets are very comprehensive. "The mayor and assembly shall have power by ordinance to establish, open, vacate, alter, widen, extend, pave, or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves, and public ground and squares, and provide for the payment of the costs and expenses thereof in the manner in this charter prescribed; and also to provide for grading, lighting, cleaning, and repairing the same, and to condemn private property for public uses, as provided for in this charter; to construct and keep in repair all bridges, streets, etc., and to regulate the use thereof."

These broad grants imply the power to make all necessary contracts for grading and paving its streets and keeping them in repair unless such powers are restrained by special provisions of the charter or by constitutional limitations. There would seem to be no doubt that under these general powers the municipality would have the same right, in order to secure good and durable work, to require of the contractor any guaranties that a private person might take in order to secure the perfection of work done for him.

Municipal officers who in contracting for such public work, should neglect to take from a contractor some kind of guaranty of the perfection of the work and materials, would be derelict in their duty and unfitted for the trust with which they had been invested. The kind of guaranty should be left to their discretion and business sense. We think no wiser or

more adequate provision for securing perfection in the completed work could be devised than that of requiring the contractor to maintain it for a reasonable time, at such cost as would compensate for the repairs necessary to preserve good work and good material from becoming imperfect from natural and unavoidable causes.    [Morse v. Westport, 110 Mo. 509.]

We are able to discover nothing in section 27, article 6 of the charter, which prohibits such a guaranty.    The restraint placed upon the assembly is that it shall not directly contract for making repairs of streets.    It requires that *"proposed work"* (which *includes repairs*), shall be let to the lowest bidder.    It also requires estimates of the cost of such work to be submitted to the assembly by the Board of Public Improvements.    It is manifest the repairs contemplated in this section are such as are needed at the time the ordinance authorizing the work is passed.    It is "proposed work" and estimates thereof must be made.    The charter does not prohibit a contract for the work necessary to preserve in good condition the improved street or in other words a guaranty of the efficiency of the completed work.    The general powers conferred by the charter give ample authority to require of contractors such guaranties and no prohibition is found or unnecessarily implied in section 27 of article six.

The validity of the ordinances should be presumed and the ordinances upheld unless a repugnance to the charter clearly appears.

II.    But it is said in the next place that the contract is void for the reason that the methods provided by ordinance and followed in the advertisements for bids and in the contract, imposes upon the property owner burdens which are unauthorized by the charter.    That under the charter the property adjacent to the street is only chargeable with the cost of the constructed pavement and the cost of repairs are payable out of the general revenue of the city, and letting a con-

tract for paving the streets and one for maintaining it under one bid gives the contractor and the city the opportunity, by collusion, to impose upon the property a part of the cost of maintenance. It is argued that this result was reached in this case for, counsel say, it is shown that the price for maintenance was required to be taken at a rate below what would be fair compensation for that work and the price for reconstruction was therefore made proportionately higher in order to secure fair compensation for the entire work.

Admitting, for argument, that fifty cents per square was not adequate compensation for maintaining the street, there was no evidence tending to prove that the contract price for reconstruction was not fair and reasonable. No complaint is made to the quality of the work or to the reasonableness of the contract price therefor. The landowner, except as a citizen and general taxpayer, is not interested in the cost of maintaining the work. No issue in this case involves his rights as a general taxpayer. The issue is really one of fraud and collusion and the burden rests upon defendant to prove that by letting the work of construction and of maintenance to the lowest average bidder an unauthorized charge was imposed upon his property.

It may be said here that municipal officers under the charter of St. Louis are selected presumably on account of their fitness and integrity. They have no private ends to subserve. We should therefore presume that their intentions are honest, and that, in the performance of their public duties, they deal fairly and justly with the citizen and property owner.

It should be kept in mind also that in matters of control over streets, and of keeping them in condition for public use, the authorities act in a business capacity, and much latitude of discretion should be allowed them in matters of detail. The charter powers in these particulars are general and very broad, and matters of detail are necessarily left almost

entirely to the discretion of those intrusted with the duty. [Gibson v. Owens, 115 Mo. 267.]

The ordinances under which Grand Avenue was improved require the contractor to maintain his work for nine years commencing one year after its completion. No one can doubt the wisdom of this requirement looking at it from a business standpoint. The evidence shows that previous work of this kind had been wanting in durability. The most careful inspection of the construction of a pavement, as it progresses, will not detect all imperfections in the materials and in the manner of construction. This the Board of Public Improvement had learned from experience. They believed that a street, paved in a proper manner with asphaltum, would not require reconstruction for ten years if properly cared for and preserved. They recognized the fact that its preservation from the effects of use and natural decay would require constant attention and the expenditure of money and labor.

In these circumstances, the ordinances were passed and the contract in question was made.

The ordinance requires the contractor to maintain his work for ten years. But the property is, under the charter, only chargeable with the work of reconstruction. Provision was therefore made for separating the cost of construction and the cost of maintenance, and requiring separate bids or estimates for each work. The contract was for but a single work, that is of reconstruction with a guarantee that the pavement would endure the ordinary uses for ten years. The lowest bidder is the person who offers to construct the pavement and maintain it in good condition for the requisite period. The ordinance provides for ascertaining the lowest bid for the entire contract of construction and maintenance as follows: "In canvassing the proposals, the lowest bid shall be ascertained by taking the aggregate of the cost of construction, or reconstruction, as the case may be, and the total cost of maintenance, for the term of years designated by the ordinance."

No objection can be seen to this method, indeed in no other way could the lowest bid be justly ascertained.

In canvassing the bids the board has before it the estimates of construction and maintenance made by the engineer together with the separate bids for construction and maintenance.   If the bid for either work is too high or if the aggregate bid is too high the board has power to reject it.   Assuming, as we must, that the board acts fairly between the city and the property owner, we are unable to see how the latter can be injured unless the accepted bid makes the cost of reconstruction more than it ought to be.   This result may follow the letting of a contract in any method imaginable, as long as contractors work in their own interests and not wholly for the public good.   The discretion must therefore be left with the municipal authorities to whom the duty has been intrusted by the people.

III.   But it is said that the Board of Public Improvement fixed the cost of maintenance at fifty cents per square, which was inadequate to preserve the pavement for ten years, and would accept no higher bid on that work, thus compelling the contractor to increase his bid for reconstruction in order to make the entire contract profitable.

In answer to this it may be said, as has already been said, that there is no evidence that the contract price for reconstruction is more than it should have been for the character of work required.   Again, if the mode adopted for letting such contract is not in violation of the charter, then the contractor should not suffer on account of the fraudulent purpose of the board unless he participated in the fraud.   Objections come too late after the improvement has been completed. [Warren v. Paving Co., 115 Mo. 580.]

But we do not think the evidence bears out the charge against the board.   The board had the right, in its discretion, to reject a bid, in which, in its judgment, the charge for maintenance was excessive.   If the board with its experience

and information, and with the estimates before it, was unwilling to accept a bid in which the charge for maintenance was over fifty cents per square per annum, we can see no reason why contractors should not have been advised that bids in excess of that charge would not be considered. The only limitation on the discretion of the city authorities in contracting for such public works is that contracts shall be let to the lowest bidder. The rule adopted by the board does not prevent contractors from proposing to maintain their work for less than fifty cents per square.

Two witnesses who were members of the board when the rule was adopted, testified on the trial. Mr. McMath testified:

"As near as I can recollect, the first thing I ever heard concerning this matter was in discussions of the board concerning the price at which maintenance had been let in the first contracts, and the opinion was expressed that one dollar a square was too much; and as near as I can recollect, General Turner expressed the opinion that about fifty cents a square was about sufficient compensation for the keeping of all the pavements in repair; and that opinion of his seemed to be—was concurred in by the other members of the board. There never was any action taken whatever, so far as I have ever learned. I have examined the records, probably a year ago I had occasion to; there is no record whatever of any formal action ever taken by the board in regard to that matter."

This witness testified that in his opinion the sum of fifty cents has not compensated the contractor for the maintenance.

Mr. Fladd testified that the members of the board concluded that they would not award a contract at more than fifty cents. He regarded that a reasonable price for maintenance. A majority of the board was evidently of the same opinion. There is nothing in the evidence tending to prove that the board did not act in good faith, for the best interests of all concerned, nor does the evidence tend to prove that an unjust

burden was put upon the property of plaintiff by the proceedings followed in awarding the contract.

In the Ullman case, *supra,* a contract was sustained which imposed the entire cost of maintenance for five years upon the adjacent property. In this case the cost of maintaining the pavement is paid by the city. The evidence in our opinion does not establish the complaint that the cost of reconstruction was rendered unjust on account of proceeding as directed by the ordinance and the rule followed by the Board of Public Improvements.

Some other questions are discussed bearing upon the legality of the bid for maintenance. If the contract for reconstruction was fairly let to the lowest bidder and the work was done in a proper manner according to contract, defendant can have nothing of which to complain, as his property is not chargeable with the maintenance. Indeed the maintenance clause of the contract is beneficial to the property owner if, as the board thought would be the case, a necessity of reconstruction would thereby be prevented for a longer period. [Morse v. Westport, 110 Mo. 509.]

We distinguish this from the Verdin case in the fact that the evidence shows that the word "maintenance" as used in the ordinance and contract has not the same application as the word "repairs" used in the charter. The obligation to "maintain" required by the ordinance is imposed as a mere guaranty of the perfection of the work when completed and the duty to preserve from decay and ordinary use. The work of "repairs," required by the charter to be let to the lowest bidder, is the restoration of a street already defective from use and decay.

We distinguish the cases further in the fact that it does not appear from the evidence in this case that the bid for construction was higher, on account of the maximum bid fixed by the board for maintenance, than it would have been for perfect work, without the guaranty.

This case is also distinguishable from the Ullman case, in that the landowner is not chargeable with the cost of maintenance.

The judgment of the circuit court ought to be reversed, and it is so ordered.

PER CURIAM.—The foregoing opinion prepared by our late associate, Judge MACFARLANE, is adopted as the opinion of the court, SHERWOOD, ROBINSON, BRACE and WILLIAMS, JJ.,concurring therein; GANTT, C. J., and BURGESS, J., dissenting; MARSHALL, J., not sitting.   The judgment of the circuit court is therefore reversed and the cause remanded with directions to the trial court to proceed in accordance with the views expressed in this opinion.